IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

TERRENCE M. HANLON              §
                               §
VS.                            §      ACTION NO. 4:03-CV-237-Y
                               §
ALFRED J. MELILLO, ET AL.      §

<u>MEMORANDUM OPINION</u>

This case is before the Court following a nonjury trial. Plaintiff Terrence M. Hanlon contends that the defendants breached fiduciary duties they owed to participants, including Hanlon, in a profit-sharing plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001-1461. After careful consideration of the evidence and argument presented at trial, the parties' post-trial briefs and the matters highlighted therein, and the applicable law, the Court's findings and conclusions are as follows:

## I. Findings of Fact

Hanlon became an employee of the Harold Schnair Sales Company in 1980 ("Schnair"), initially working in the sales department and ultimately becoming executive vice-president. Schnair specialized in aftermarket sales of automotive and other products to automotive retailers, wholesalers, convenience stores, distributors, and others. At the time Hanlon commenced working for Schnair, defendant Alfred J. Melillo was the vice-president of sales. Melillo became the company's president and sole shareholder in 1984.

On April 1, 1984, Schnair established defendant Harold Schnair Sales Company, Inc., Profit Sharing Plan ("the plan"), a profit-sharing plan governed by ERISA. Hanlon and Melillo were the primary investors in the plan, although several other employees also participated.[1] Melillo is the named trustee of both the plan and defendant Harold Schnair Sales Company, Inc., Profit Sharing Trust ("the trust"), which was made part of the plan. The plan was administered by defendant Sharon Wake and Wake Financial Services, Inc., until December 2000, at which time Wake resigned as administrator.[2] Schnair continues to maintain the plan and the trust for the benefit of participants and beneficiaries.

In 1993, Hanlon and Melillo executed an employment agreement and a stock-purchase agreement under which Hanlon was to purchase Schnair's stock sometime within the ensuing five years. In the interim, Hanlon worked as Schnair's sales manager. The stock-purchase agreement expired by its terms in 1998, however, with the sale never having been consummated. Because of the expected loss of a major client, Chief Auto Parts, as a result of industry consolidation, the stock-purchase agreement was essentially nullified under the formula the agreement used to calculate the company's value.

Instead, Hanlon and Melillo ultimately entered into an asset-

---

[1]In 1994, Schnair commenced a defined-benefit plan and ceased contributions to the profit-sharing plan.

[2]Wake testified that she "believe[d her] duties started in 1995." (R. Vol. III at 36.) The Court notes, however, that the pretrial order's stipulated-facts section indicates that "[i]n 1989, the Plan was amended and Wake became Plan Administrator." (Joint Pretrial Order [doc. 263] at 34, ¶ 13.)

purchase agreement that was finalized in 2001.  Hanlon purchased all of the assets of Schnair and created a new company, Schnair Sales and Service.  Hanlon did not, however, purchase the plan or the trust.  The new company operated out of Schnair's Arlington, Texas, location for a few months prior to moving to a new location in June 2001.

In March 1993, Melillo had opened an investment account for the benefit of the plan with the predecessor firm of defendant RBC Dain Rauscher, Inc. ("Dain Rauscher").  Robert McCarthy was initially designated as the account's investment executive. McCarthy tended to invest the plan's assets in mutual funds.  In the summer of 1995, McCarthy left Dain Rauscher to start a business, and management of the plan's investment account, which was valued at $522,778.97 on July 31, 1995, was transferred to another representative of Dain Rauscher, defendant J. Everett Airington (sometimes referred to herein jointly with Dain Rauscher as "the Dain Rauscher defendants").  Airington also became the broker on both Melillo's and Hanlon's personal accounts with Dain Rauscher.

After Airington took over management of the account, he recommended that Melillo sign agreements authorizing the use of margin and option writing in the account, despite the fact that Dain Rauscher's policies advised against the use of margin trading in accounts covered by ERISA and deemed it inappropriate to charge these types of accounts interest.  Melillo had told Airington that he wanted growth in the account, but he did not authorize or

instruct him to divest the account of all of the mutual funds. A few months later, however, Airington liquidated the entirety of the account's assets. Instead of investing primarily in mutual funds as McCarthy had done, Airington commenced investing the account's assets in riskier, more aggressive stocks. Additionally, Airington quickly began churning the account by engaging in frequent trading and a high number of trades that generated fairly significant commissions for Dain Rauscher relative to the amount of the account's assets.[3] He also used margin trading in the account, for which the plan paid a significant amount of interest to Dain Rauscher, and he often ended up having to sell stock at inopportune times to cover margin calls.[4]

Melillo let Airington decide how to invest the assets in the investment account and almost always accepted his recommendations about stock purchases and sales. He relied solely on Airington to provide strategy for investing the account's assets and to determine where to invest the assets; and Airington understood Melillo was relying on him as a primary--if not sole--basis for investment decisions. Melillo was not informed by Airington or anyone else at Dain Rauscher about what the use of margin loans entailed, nor was he asked for authorization to sell stocks to

---

[3]Not counting any commissions that may have been charged when Airington first liquidated the account's assets, Dain Rauscher charged the plan commissions in the amount of $86,678.78 for 1996; $83,706.04 for 1997; $32,734.00 for 1998; $24,256.00 for just the first half of the year in 1999. At the end of 1996, the investment account's balance was $336,663.93; it was $299,037.74 by the end of 1997; $104,062.08 in 1998; and by 1999, $391,519.20.

[4]From August 1995 through July 1999, the plan paid Dain Rauscher $64,863.58 in margin interest.

cover the margin calls.  Furthermore, prior to June 1999, Melillo did not authorize most of the stock sales and purchases in the account prior to their execution.  Nevertheless, he never called Dain Rauscher to complain about any of the sales and purchases made in the account after he received statements reflecting the trades that had been made.

In spring of 1999, Wake requested that Melillo set up a meeting between both of them and Airington.  Wake had been receiving copies of the Dain Rauscher account statements from Schnair's bookkeeper, albeit on a sporadic basis.  Over the previous year, she had become increasingly concerned about the plan's account with Dain Rauscher.  Specifically, Wake was troubled by the increasing use of margin loans in the account; the account's lack of diversification, which appeared responsible for its having suffered significant losses over the prior year; and the account's significant value fluctuation on a month-to-month basis.  She also wanted Melillo to permit Dain Rauscher to send her copies of the account statements directly, inasmuch as she had been having trouble getting copies from Schnair's offices on a regular basis.

Additionally, Wake had received a letter from Hanlon dated May 12, 1999, in which he requested a detailed accounting of investment transactions in the plan during the 1997 and 1998 plan years. Hanlon sent her a second letter dated May 28, 1999, in which he requested an annual report for the 1998 plan year and a list of the plan's assets, liabilities, income, and expenses for the 1998 and 1999 plan years.  Hanlon had received two statements of his

interest in the plan within a relatively short period; both statements showed losses in the value of his interest--the second statement reflecting a loss of approximately $60,000--during a time when he would have expected a gain based on the overall performance of the market. As a result, he had become concerned about the plan's investments and was attempting to discern what had caused the losses.

The meeting requested by Wake was held in June 1999 at the Schnair offices. Hanlon was not present at the meeting, but he was present in the Schnair office at the time and knew the meeting was taking place. At the meeting, Melillo explained to Airington that Hanlon was upset about the significant losses that had occurred in the investment account, and he asked Airington to talk to Hanlon about it. Wake, Melillo, and Airington also discussed the fact that margin trading had been used in the account. They agreed that no additional margin trading would occur in the account. As a result of the meeting, Dain Rauscher began sending account statements directly to Wake and to Hanlon, in addition to those it was already sending to Schnair.[5]

At the conclusion of the meeting, it was uncertain whether Airington and Dain Rauscher would continue handling the plan's investment account. Melillo indicated that he wanted to discuss all of the issues raised at the meeting with Hanlon and get his

_____

[5]Indeed, Airington testified that "Melillo was very specific in making sure that Mr. Hanlon receive everything that was sent out by [Dain Rauscher]." (R. Vol. 2 at 69.) And Wake testified that Melillo "had always told [her] to give [Hanlon] any information he wanted about the plan." (R. Vol. 3 at 69).

help in making the final decisions. Airington expressed during the meeting his belief that he could still accomplish the objectives of the plan and that he would do everything he could to make up some of the prior losses by investing in growth stocks and initial public offerings ("IPOs") in which Dain Rauscher was involved. He also made similar statements to Hanlon when they talked about the plan's losses.[6] But in neither instance did Airington guarantee any particular result. Soon thereafter, however, the account's balance trended upward. And, after the June 1999 meeting, Hanlon, Melillo, and Wake started paying much more attention to the account and how it was being invested.

Also during spring of 1999, Melillo hired Cynthia Stamer, an attorney from Locke Liddell & Sapp, L.L.P. ("Locke Liddell"), to investigate Dain Rauscher's handling of the plan's investment account. Melillo had been referred to Stamer by Crawford Gates, who was a financial advisor to Hanlon, the defined-benefit plan, and even to Schnair for awhile. Rene Polk, a compliance officer with Dain Rauscher, was in charge of formulating Dain Rauscher's response to Locke Liddell's inquiries. On August 20, 1999, Polk advised Airington that Locke Liddell had instructed Dain Rauscher to cease using margin in the investment account, which instruction was similar to the agreement reached by Melillo, Wake, and Airington at their June 1999 meeting. No margin interest was

---

[6]Hanlon testified that he met with Airington a couple of times during the spring of 1999 and discussed the poor performance in the plan's investment account. Airington told him that "he felt [confident] that he could restore [the account's value], bring it back to good health, but it would take time." (R. Vol. 4 at 29.)

incurred by the plan, and thus no margin trading occurred, after July 1999.  On August 24, 1999, Mickey Geron, Dain Rauscher's branch manager, instructed Airington to cease making trades for Melillo without a written confirmation of his authorization for the trade prior to Airington's entering the order for the trade.[7] Nevertheless, there were approximately 150 trades made by Airington in the plan's investment account from September 1999 through 2000, and Dain Rauscher produced written documentation reflecting authorization for only five of those trades.  Melillo admitted, however, that he was asked for verbal authorization for trades much more frequently after the June 1999 meeting.  And neither Hanlon nor Melillo have pointed to any specific trades made after June 1999 that were not authorized by Melillo.

Locke Liddell ultimately recommended to Melillo that the plan sue Dain Rauscher.  Locke Liddell was concerned about the level of trading activity in the account, the use of margin investments, whether trades were occurring at the discretion of the broker, and the amount of commissions charged for the trading.  Additionally, it was unclear to Stamer whether any guidelines were being followed in investing the account's assets; if they were, she believed they were not appropriate for this type of account.

Locke Liddell was not, however, willing to represent the plan in any litigation against Dain Rauscher.  As a result, Stamer

---

[7]Specifically, Geron's email to Airington stated as follows: "[A]ll trades henceforth should be supported by a fax confirming the transaction.  Let's make sure that we don't slip up on this point.  If Melillo is out of town and wants to trade, he needs to have someone fax us prior to entering the order."  Pl.'s Ex. 6.19 at DR 4631.

referred Melillo to attorney Ed Perrin. Perrin agreed to take the case, but Melillo ultimately decided, after discussing the matter with Hanlon and attempting to obtain a contingency agreement with a few other law firms, not to sue Dain Rauscher.

At the time of Hanlon's meetings with Airington in the spring of 1999, Hanlon expressed his displeasure with the account's performance and his discomfort with the past use of margin trading in the account. He also asked Airington for information about how the plan's investment account was set up and what was being done in the account. As a result, on June 22, 1999, Airington sent Hanlon profit and loss statements for the account, which he reviewed. These statements showed the stocks held by the plan, the dates on which they were purchased and sold (and thus the length of time they were held), the price paid for each stock bought and sold, and the profit or loss made on each stock. Hanlon considered suing Airington and Dain Rauscher in 1999, but ultimately decided against it.[8]

Indeed, Hanlon had contacted his own attorneys about the profit-sharing plan. He was friends with Mark Fankhauser, an attorney with Little Pedersen Fankhauser, L.L.P. (the law firm

_____

[8]Specifically, Hanlon testified as follows:

I do remember having some thoughts as to, with the losses that we had suffered, wondering what we might do to recoup. If . . . litigation was part of that thought process, yes, I did think about it. At the same time, I did not consider pursuing litigation because of the process of evaluation, plus or minus evaluations, if you will, and given what we have today, my little understanding of the law in terms of what a lawsuit is, what it entails, my relationship with Dain Rauscher, Mr. Airington. So I weighed those two and chose Mr. Airington.

(R. Vol. 4 at 95.)

currently representing Hanlon). Hanlon went to see Fankhauser on May 27, 1999, soon after he initially requested information from Wake about the profit-sharing plan. Fankhauser was initially consulted regarding Hanlon's purchase of Schnair's assets, but issues regarding the profit-sharing plan arose during the course of their discussions.

Fankhauser had several conversations with Crawford Gates about the asset purchase and the profit-sharing plan. Fankhauser's notes from his June 1 conversation with Gates reflect that he learned the following information:

> [Gates] asked to be allowed to manage p.s., but [Melillo] didn't ok it
> [Wake] called [Gates] after getting [Hanlon's] first letter. [Gates] is going to see [Melillo] Thursday (6/3) & give him atty.'s name
> **[Gates] concerned that Terry could have some liab. as an officer.**
> **UBIT—due to margin loans 800K stocks/options; 500K margin debt**
> **individual promissory note 25K**
> **62K IPO investment--carried at this value but no way to ascertain value, so should be 0.**

(Dain Rauscher Ex. 61 at TH 2405-06 (emphasis added).) Notes from another conversation between Gates and Fankhauser dated March 17, 2000, indicate as follows:

> Old PS plan--
> **potential breaches of fiduciary duty in this plan-- primarily because of investments**
> **Stamer's ofc. did a bunch of work--said they had broker dead to rights**--sent letters to Dain Rauscher & account suddenly began doing well. Has gone from 200K-580K since last fall (thru 2/29)
> . . . .
> **Supposedly several hundred K interest expense for margin loans inside PS plan.**

(Dain Rauscher Ex. 61 at TH2408 (emphasis added).)

During the spring of 1999, Hanlon also learned that Melillo, on behalf of the plan, had hired Stamer to review the plan's investments. Hanlon and Melillo had a few conversations regarding the plan's poor performance and whether to sue Dain Rauscher. Melillo discussed Stamer's conclusions with Hanlon and suggested that they join together for a possible lawsuit. He stressed, however, that there were no guarantees and that a lawsuit would cost a lot of money, with he and Hanlon possibly being forced to relinquish their bonuses to cover the expenses. At this time, Schnair was having difficulty financially due to the loss of the Chief Auto Parts account. Hanlon indicated that he would pass on foregoing his bonus to hire the attorneys. In addition to not wanting to forego his bonus, Hanlon felt that because Melillo was the plan's trustee, he should be responsible for paying for any litigation regarding the plan's investments. But by September 3, 1999, Hanlon told Airington that he was comfortable going forward with Airington and saw no need for the attorneys' further involvement. By that time, the account's value had bounced back and was doing fairly well.

In early 2000, however, the investment account's balance starting declining again, which was consistent with the overall performance of the market at this time. Airington telephoned Melillo twice in the spring of 2000 to recommend that certain stocks in the account be liquidated because he believed they were overpriced. After discussing the matter each time, however, Melillo decided to stay the course. The investment account's

balance on February 29, 2000, was $535,065.60; by December 29, 2000, the account's balance had plummeted to $61,900.60.

In addition to the Dain Rauscher account, the trust owned certain other assets. These assets included the Sid Ali Benouard promissory note and investments in National Digitronics, Concentric Network ("Concentric"), and Redwood Leasing.

In September 1995, Melillo authorized the acceptance of a $25,000 promissory note from Sid Ali Benouard, who was opening a restaurant. Melillo funded the loan by making a margin withdrawal from the plan's investment account with Dain Rauscher. Benouard made two or three small payments on the note, but the restaurant closed approximately one year after opening. Nevertheless, the full amount of the note remained on the listing of plan assets Wake sent to Hanlon in June 1999, which listed the plan assets through March 1998, even though Melillo knew by that time that the note was uncollectible. The plan incurred 10.5 percent interest on the margin loan, but Benouard was only supposed to pay 8.75 percent interest under the promissory note.

Melillo also authorized McCarthy to withdraw $50,000 from the plan's account for an investment in National Digitronics. In return, the plan received a promissory note. Hanlon and Melillo knew the people who owned the company, and both assured Wake when she took over as administrator of the plan that it was a good investment because National Digitronics was developing an ingenuous new product for the automotive industry. On the listing of assets Wake delivered to Hanlon in response to his May 1999 letters, the

investment in National Digitronics was valued at $62,800. Again, Wake obtained this value either from Melillo or Schnair's bookkeeper. Ultimately, however, the plan lost its investment in National Digitronics.

In February 1996, Melillo authorized Airington to make two withdrawals from the investment account so Melillo could invest in Concentric, the company that Robert McCarthy left Dain Rauscher to start. A withdrawal of $103,000 was made on February 13, and another withdrawal of $73,000 was made on February 15. These amounts were used to purchase a bundle of Concentric's stock. Because no promissory note was ever signed, Wake decided to treat the withdrawals as if Melillo were making an investment for the plan. The shares were never placed in the plan's account, but instead were held in Melillo's personal account. Over three years later, on March 17, 1999, Melillo deposited $160,000 back into the Dain Rauscher account to pay back what he believed he had withdrawn from the account to make the Concentric stock purchase. The money came from the sale of restricted Concentric stock. Hanlon did not learn the details of the Concentric transaction until the discovery process in this lawsuit.

Redwood Leasing was supposed to be an income-generating equipment-leasing program that was designed to take advantage of lease-cap rates on industrial equipment. It was internally diversified and, at the time the investment was made, appeared that it would have a fairly decent yield with low risk. On the listing of plan assets sent to Hanlon in response to his May 1999 letters,

Wake listed the value of the investment as $60,000 as of March 31, 1998, which value she obtained from Melillo or Schnair's bookkeeper. The 1997 partnership schedule K-1 for Redwood Leasing reflects, however, that the company had a value of only $8,686.57 at the end of that year.

On the dates listed below, the plan's total assets were valued as follows:

March 31, 1997--$790,406.42

March 31, 1998--$653,981.40

March 31, 1999--$327,117.48

March 31, 2000--$534,085.08

March 31, 2001--$ 38,661.15

March 31, 2002--$ 34,984.01

On the same dates, the plan's Dain Rauscher account balances were as follows:

March 31, 1997--$278,835.05

March 31, 1998--$325,860.40

March 31, 1999--$284,575.24

March 31, 2000--$502,256.88

March 31, 2001--$ 38,491.15

March 31, 2002--$ 34,814.01

From 1993 through the 1995 plan year, the plan gained in value. In the 1996 plan year, the plan lost .03 percent. In the 1997 plan year, the plan suffered a 17.3 percent loss, and for the 1998 plan year, the plan suffered a 32.9 percent loss.

When Hanlon moved Schnair Sales and Services out of Schnair's

facilities in Arlington in June 2001, he hired some temporary workers to clean up the building for the new tenant. Melillo told Hanlon to take whatever corporate records he wanted as long as Melillo could access them if necessary. Hanlon identified the records he wanted to keep and had his personnel move them to Schnair Sales and Service's new offices. Melillo went through the remaining files and separated them into several different piles and marked them "storage," "personal,", "trash," and the like. When Melillo and a neighbor subsequently arrived to remove the files Melillo wanted to keep, however, the Arlington facility had already been completely cleaned by Hanlon's cleaning crew. Unbeknownst to Hanlon, they had discarded almost all of Melillo's files. Melillo tried to retrieve them from the Arlington landfill, to no avail.

Hanlon filed this suit against only the Melillo defendants (Melillo, Schnair, the plan, and the trust) on March 21, 2003. His claims against Airington and Dain Rauscher were added on October 7, 2003. However, Hanlon signed a tolling agreement with Airington and Dain Rauscher on July 24, 2003.

Hanlon's damages expert, Colin Henderson, testified that, based upon "the prudent investor modern portfolio principles of ERISA and Department of Labor Regulations and Guidelines," (R. Vol. V at 109), he believed the Dain Rauscher account should have been invested in a fifty/fifty mix of broadly diversified stocks and intermediate government corporate bonds. He normally would have placed the ratio at forty percent equities and sixty percent bonds, but the plan seemed to indicate that a more risky position was

preferable. Thus, in calculating his estimated damages, he assumed fifty percent of the Dain Rauscher account's assets were invested in stocks similar to those in the S&P 500 composite stock index, and fifty percent were invested comparably to the Shearson Lehman bond index. If invested in that manner from March 31, 2000, he calculated that the plan's damages are $702,908. If, however, the plan were not invested in this manner until July 31, 2000, the plan's damages are $336,531.

## II. Conclusions of Law

Hanlon contends that Melillo and the Dain Rauscher defendants breached their fiduciary duties to the plan. ERISA requires that

> a fiduciary discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>
> (A) for the exclusive purpose of:
>
>    (i) providing benefits to partici-pants and their beneficiaries; and
>
>    (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so . . . .

29 U.S.C.A. § 1104(a) (West 1999). Melillo was a named fiduciary of the plan, but the Dain Rauscher defendants were not. As a

result, Hanlon must prove that Airington and Dain Rauscher became plan fiduciaries.

ERISA provides that a person becomes a fiduciary to a plan if he exercises control over the plan or its assets:

> [A] person is a fiduciary with respect to a plan to the extent (I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C.A. § 1002(21)(A) (West 1999). "[T]he definition of fiduciary under ERISA should be liberally construed." *Thomas, Head & Greisen Employees Trust v. Buster*, 24 F.3d 1114, 1117 (9th Cir. 1994). To be a *de facto* fiduciary based upon management or disposition of a plan's assets, Airington must have "caused [Melillo] to relinquish [his] independent discretion in deciding whether to sell the [plan's] stock and . . . follow instead the course prescribed by [Airington]." *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., Inc.*, 793 F.2d 1456, 1460 (5th Cir. 1986), *cert. denied*, 479 U.S. 1034 (1987). To be a fiduciary as a result of providing investment advice for a fee with respect to plan assets, Airington either must

> (A) Ha[ve] discretionary authority or control . . . with respect to purchasing or selling securities or other property for the plan; or

> (B) [Have r]ender[ed investment advice] on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between [himself] and the plan or a fiduciary with

respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21(c)(1)(ii).

The Court concludes that Airington was a *de facto* fiduciary of the plan prior to the June 1999 meeting, inasmuch as he executed most of the trades in the plan's investment account without even consulting Melillo until after the fact. The Court also concludes that Airington assumed investment-advice-for-a-fee fiduciary status during this time period as well; Melillo and Airington had an unwritten mutual understanding that Airington would regularly provide the primary basis for investment decisions and strategy with respect to the plan's investment account, and he received commissions for each trade. *See Thomas, Head*, 24 F.3d at 1120 (concluding that commissions constitute "fees or other compensation" under 29 U.S.C. § 1002(21)(A)(ii)). After the June 1999 meeting, Airington ceased exercising authority or control over plan assets, but he remained a fiduciary to the plan under the investment-advice-for-a-fee prong of the test.

Nevertheless, Hanlon's claims against Airington and Dain Rauscher for any fiduciary breaches they committed prior to the June 1999 meeting are barred by the applicable statute of limitations.[9] ERISA provides for a six-year statute of limitations

_____

[9]Because of the Court's conclusions regarding Hanlon's claims against Airington, the Court need not determine whether Dain Rauscher actively and knowingly participated in Airington's alleged breaches so as to give rise to

unless a claimant has actual knowledge of his claims, in which the
period is reduced to three years:

> No action may be commenced under this subchapter with
> respect to a fiduciary's breach of any responsibility,
> duty, or obligation . . . after the earlier of--
>
>> (1) six years after (A) the date of the last action
>> which constituted a part of the breach or
>> violation, or (B) in the case of an omission, the
>> latest date on which the fiduciary could have cured
>> the breach or violation, or
>>
>> (2) three years after the earliest date on which
>> the plaintiff had actual knowledge of the breach or
>> violation[.]

29 U.S.C.A. § 1113 (West 1989). The term "actual knowledge" means
"'actual knowledge of all material facts necessary to understand
that some claim exists, which facts could include necessary
opinions of experts, knowledge of a transaction's harmful
consequences, or even actual harm.'" *Maher v. Strachan Shipping
Co.*, 68 F.3d 951, 954 (5th Cir. 1995) (quoting *Gluck v. Unisys
Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992)). By establishing actual
knowledge as the prerequisite for the shorter limitations period,
ERISA imposes a "stringent requirement." *Gluck*, 960 F.2d at 1176.
To benefit from the three-year limitations period, a defendant must
show that the plaintiff "'actually knew not only of the events that
occurred which constitute the breach or violation but also that
those events supported a claim for breach of fiduciary duty or
violation under ERISA.'" *Maher,* 68 F.3d at 954 (quoting *Int'l
Union v. Murata Erie N. Am.*, 980 F.3d 889, 900 (3d Cir. 1992).

---

respondeat superior liability under ERISA. *See* Dain Rauscher Defs.' Reply to
Hanlon's Resp. to Mot. for Summ. J. [document number 239] at 13.

The Court concludes that Hanlon had actual knowledge of most of the breaches in which he alleges the Dain Rauscher defendants engaged more than three years prior to filing suit against them. Hanlon knew there had been margin trading in the account as early as spring 1999, when he first began discussing the account's precipitous decline with Airington. He knew that Airington had engaged in frequent trading and churning of the account as well, inasmuch as in June 1999 Airington gave him, in response to his inquiries, the profit and loss statements from which he could glean this information. And, Hanlon knew, through his attorney, that the Locke Liddell lawyers had Airington and Dain Rauscher "dead to rights" as a result of the trading going on in the account, including the large amounts of margin interest charged to the account.[10] The Court concludes that Hanlon had actual knowledge of his claims against the Dain Rauscher defendants, at the latest, by March 17, 2000, the date his attorney discussed Locke Liddell's findings with Crawford Gates. Indeed, Hanlon said it best:

> I do remember having some thoughts as to, with the losses that we had suffered, wondering what we might do to recoup. If . . . litigation was part of that thought process, yes, I did think about it. At the same time, I did not consider pursuing litigation because of the process of evaluation, plus or minus evaluations, if you will, and given what we have today, my little understanding of the law in terms of what a lawsuit is, what it entails, my relationship with Dain Rauscher, Mr. Airington. So I weighed those two and chose Mr. Airington.

(R. Vol. 4 at 95.) Hanlon weighed the prospects of a lawsuit in

---

[10]The knowledge of Hanlon's counsel is attributable to him. *See In re Kensington Int'l Ltd.,* 368 F.3d 289, 315 (3d Cir. 2004) ("any facts known by the attorney may generally be imputed to the client").

juxtaposition with his relationship with Airington and chose to preserve the latter. Unfortunately, he stuck with that choice for more than three years. As a result, all of Hanlon's claims against Airington and Dain Rauscher based on events that occurred prior to July 24, 2000 (three years prior to the July 24, 2003, tolling agreement with the Dain Rauscher defendants), are time-barred.

Hanlon has attempted to invoke principles of equitable tolling to avoid limitations. The Court concludes, however, that Hanlon cannot escape the time bar as a result of any promises made to him by Airington. Airington simply did not lull Hanlon into sitting on his rights. *See Roush Inv. Profit Sharing Plan v. The New England Mut. Life Ins. Co.*, 311 F.3d 581, 587-88 (3d Cir. 2002) (reversing district-court decision that ERISA claims were time-barred; noting that even though the plaintiffs may have had actual knowledge outside of the three-year limitations period, a letter from the defendant's lawyer promising that "all would be corrected and without prejudice to [the plaintiff's rights" lulled the plaintiff into inaction.) Although Airington expressed his belief that he could make up the losses in the plan if given enough time, he made no guarantees to Hanlon. *Cf. Ramirez v. City of San Antonio*, 312 F.3d 178, 184 n.6 (5th Cir. 2002) ("An employer's promise to review--and potentially rectify--an earlier employment decision does not toll the limitations period.) Rather, Hanlon made a conscious decision not to pursue his claims and to cease the attorneys' involvement after the Dain Rauscher account again began increasing in value.

Regarding the period that is not barred by limitations (post July 24, 2000), Hanlon has failed to prove that Airington and Dain Rauscher engaged in any breaches of fiduciary duties during this time. Although Hanlon complains of the Dain Rauscher defendants' failure to diversify the account or implement stop-loss protection, Hanlon has failed to prove that the Dain Rauscher defendants had the authority to make those decisions during this time frame. And, the Court notes that to the extent Hanlon complains about the lack of diversification, he was fully aware and apparently condoned Airington's suggestion that the account's assets be invested in growth stocks and IPO's in order to attempt to re-gain value. Furthermore, regarding stop-loss protection, Hanlon has failed to demonstrate that a reasonably prudent fiduciary acting in like circumstances during this time period would have employed those types of measures to guard against loss in the account.

Except for his claims regarding the Concentric transaction, the details of which Hanlon did not learn until after filing this lawsuit, Hanlon's claims against Melillo regarding problems in the Dain-Rauscher investment account prior to the June 1999 meeting (i.e. margin trading, churning, etc.) are likewise time-barred. Hanlon contends in his written closing argument, however, that Melillo engaged in numerous fiduciary breaches after March 31, 2000 (three years prior to Hanlon's filing of suit against Melillo), which the Court summarizes as follows:

> (1) failing to sue the Dain Rauscher defendants for their handling of the investment account's assets, charging unreasonable fees, and churning the account;

(2) failing to disclose to the plan's participants and beneficiaries the information he obtained from Locke Liddell;

(3) failing to prudently invest the plan's assets and diversify the investments so as to minimize the risk of large losses, including failing to evaluate the investments proposed by Airington and monitor his performance;

(4) failing to pursue a claim against Sid Ali Benouard based on his promissory note to the plan; and

(5) failing to accurately disclose to participants and beneficiaries the values of plan assets, instead causing them to be reported with inflated values.

*See* Hanlon's Closing Argument [doc. 237] at 17, 18-20.

With respect to Melillo's failure to sue the Dain Rauscher defendants for their handling of the plan's investments, charging unreasonable fees, and churning the plan's account, the Court concludes that Hanlon has waived any right to recovery for those, given that he was not only aware of these activities but also was complicit in the decision not to pursue litigation regarding them. And as for allegedly failing to disclose information from Locke Lidell, the Court found that Melillo discussed Locke Liddell's conclusions with Hanlon, but Hanlon was not willing to forego his bonus to fund a lawsuit. In fact, once the investment account's balance began growing again, Hanlon told Airington that the attorneys should not be involved any longer. The Court is disinclined to hold Melillo responsible to Hanlon for a decision in which Hanlon was, at least at the time, in agreement.

Regarding Hanlon's contention that Melillo failed to prudently invest the plan's assets and diversify the investments so as to minimize the risk of large losses, including failing to evaluate

the investments proposed by Airington and monitor his performance, the Court concludes that Hanlon has not demonstrated that Melillo acted unreasonably under the circumstances. Hanlon has failed to show that after March 2000, Melillo failed to exercise the care, skill, prudence, and diligence that a prudent man acting in like capacity and circumstances exercised at the time. Hanlon simply has failed to demonstrate that a reasonably prudent trustee in a similar situation would have implemented stop-losses or sold the stocks as recommended by Airington prior to their rapid decline in the volatile market that existed in 2000. And, as for the lack of diversification of the account, again the Court concludes that Hanlon was aware of and approved the methods being used by Airington (i.e. investment in growth stocks and IPO's) to attempt to rebuild the account's value.

Regarding the Sid Ali Benouard note, the Court found that it was listed as a plan asset long after it became clear that Benouard would not repay it. Hanlon has failed to demonstrate, however, that Melillo likely could have collected anything from Benouard had he sued. As a result, the Court cannot conclude that his failure to do so was a breach of his duties or that it resulted in any damages to the plan.

Hanlon also complains that Melillo failed to accurately disclose the plan's assets to participants and beneficiaries. It is clear that assets were listed on the plan's statements, including the listing of assets Wake gave to Hanlon in June 1999, either at inflated values or long after they should have been

written off.  Hanlon fails, however, to point to any particular damages he or the plan suffered as a result of this inaccurate reporting.

Regarding the Concentric transaction, the Court agrees with Hanlon that Melillo breached his fiduciary duty to act solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to them.  "ERISA expressly prohibits the use of assets for purposes other than the best interests of the beneficiaries, and the language of section 1109(a) providing for disgorgement of profits from improper use of trust assets is the appropriate remedy."  *Leigh v. Engle*, 727 F.2d 113, 122 (7th Cir. 1984).  Melillo withdrew $176,000 from the plan to make the Concentric investment, but the shares for the investment were held in Melillo's personal account.  After Wake discovered that no promissory note had been executed regarding the withdrawal, she and Melillo decided to treat the withdrawal as an investment on behalf of the plan.  After Hanlon started making inquiries about the value of the plan, however, Melillo deposited $160,000 back into the account--less than the original amount withdrawn.

Hanlon has wholly failed to demonstrate, however, whether any profit was made on the Concentric transaction and, if so, how much. Hanlon contends that "'the trustee has the burden of showing which property and profits are his.'"  (Hanlon's Reply to Defs.' Closing Arguments [doc. 348] at 8 (quoting *Leigh*, 727 F.2d at 138). Assuming there is evidence that a commingled transaction resulted in a profit, the Court agrees.  In this case, however, after full

pretrial discovery, Hanlon has failed to demonstrate that the Concentric transaction resulted in any profit whatsoever. As a result, the only damages the Court can determine with reasonable certainty that the plan suffered as a result of Melillo's actions is a reasonable amount of interest on the money Melillo removed from the plan for the approximately three years and one month that it was missing, coupled with the $16,000 difference between what was withdrawn and the amount ultimately replaced. The Court determines this amount to be $50,684.09.[11] Prejudgment interest shall accrue on this amount at a rate of six percent per annum until paid. *See Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984-85 (5th Cir. 1991); TEX. FIN. CODE ANN. § 304.003 (2006); http://www.federalreserve.gov/releases/h15/Current (reflecting current prime rate of six percent).

Finally, Melillo has contended throughout these proceedings that any liability that might be imposed upon him should be mitigated by the fact that Hanlon's cleaning crew destroyed most of the documents he kept regarding the profit-sharing plan that would support his defenses. To be entitled to an adverse inference as a result of spoliation of documents, however, Melillo was required to prove that the documents were destroyed in bad faith. *See Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 340 (M.D. La. 2006) ("the Fifth Circuit only permits an adverse inference sanction

---

[11]The Court has imposed a six-percent interest rate for the period the money was missing from the plan. So, interest earned the first year is $10,560 ($176,000 x 6%); for the second year, $11,193.60 ($186,560 x 6%); for the third year, $11,865.21 ($197,753.60 x 6%); and $1,065.28 for the additional month ($209,618.81 x 6% = $12,577.13 ÷ 366 = $34.36 per day x 31 days), for a total of $34,684.09.

against a destroyer of evidence upon a showing of 'bad faith' or 'bad conduct').  The Court found, however, that the cleaning crew disposed of Melillo's documents without Hanlon's prior knowledge. As a result, the Court concludes that Hanlon did not engage in bad faith regarding the destruction of Melillo's documents, and Melillo is therefore not entitled to an adverse inference or other sanction as a result of the destruction of those documents.

SIGNED February 8, 2008.


_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE